Good morning, Your Honors. My name is John Tufano, and I represent the appellant and the plaintiff pro per in this matter, Patricia Neal Watson. Ms. Watson is here today. She's first time in San Francisco and first time in a federal courthouse. She's quite happy to be here, and we appreciate your time. Of course. Your Honors, before I start, I'd like to know if there is any particular area of the three claims that are before the Court on appeal that the Court would like me to take some time with before I go into what I suppose Judge Sneed was saying, get to the point, or maybe I won't get to the point. That remains to be seen. But if there's anything that the Court would like me to focus on, I'd like to do that first. Well, why don't you talk to us, of course, you've read the briefs and the record. What do you want to emphasize this morning? Well, I think the important thing to emphasize this morning is the time frames in which the workplace started and the extended litigation and charges that were constantly being filed in the workplace. By my record, I have it starting as early as October 97 and continuing into April 2001. That includes both lawsuits that are being prosecuted, and that would be Watson 1, as I refer to it, which was filed in August of 1998 and proceeded to litigation all the way through into December 2001, which actually postdates the time frames for the in her workplace. So I think as a backdrop, that's extremely important, because we don't have a situation where we can disaggregate acts from charges. The charges were ongoing. The acts were ongoing. The litigation was ongoing. In fact, I will represent to the Court that I represented Ms. Watson in Watson 1 up until trial. So this was extended litigation that was going on in the background, while the matters which are now today before the Court were occurring in her workplace. Can you clarify something for me? She was pro se initially, correct? That's correct, Judge Block. At the trial, she was pro se also, correct? That's correct, Judge Block. I'm just trying to understand the dynamics of this. You know, from the perspective of the district court judge, I'm trying to place myself in the shoes of the judge here. He granted summary judgment on the hostile environment claim. He tossed that out as a matter of law. But he allowed the retaliation claim to be tried, correct? As I understand it, that's correct, Judge Block. And she represented herself. And at the end of the plaintiff's case, he decided to grant judgment as a matter of law and not let the case proceed and let the jury decide the case. That's what happened here as a practical matter, correct? Procedurally, that is correct, Judge Block. Do you have a sense of what was going on in the courtroom at that time? Because it seems that it's the exception to what we normally like to do as district court judges. When you get that far, let the jury make the determination to reserve on the issues of law. So give me some sense of what was going on there, if you know. If I had to hypothesize, I wasn't there. But if I had to hypothesize, I'd say that it sounds like a circus. It sounded to me as though Ms. Watson, who has no legal skills whatsoever, gets through presentation of her evidence and Judge Pro grants this motion to dismiss on the retaliation claim after everything has come in. My sense of it was it lasted several days. And I don't know, the record seemed to me to be rather voluminous and extensive. What seemed to me is that perhaps Judge Pro and counsel for the appellee, Judge Block, just failed to take into consideration the fact that the retaliatory hostile work environment that she was in, being created by her coworkers, okay, was quite problematic and quite linked to what was going on with respect to all the charges and the litigation already in process, sir. Let me share with you my overview. I have a sense that there was a lot of frustration that happened there. It's a practical matter. You deal with a pro se plaintiff. She has the right to have access to the court and to, by all means, litigate her claims here. But I'm looking at this from this perspective. You have the filing of a lawsuit in August 1998, correct? Yes, sir. All right. Certainly that's a protected activity. And I guess under the literal meaning of the law, the continuation of that lawsuit is also a protected activity. The participation clause. Prosecution participation. That goes on for a couple of years. And then during the span of that period of time, you have multiple claims here on her behalf that she's been adversely affected, so to speak, in her employment. Do you see a difference when you're dealing with this concept of retaliation during the lengthy pendency of a lawsuit? It's a practical matter. When somebody brings a lawsuit, I guess to some extent, there's an automatic prompt to face your case that would arise over a period of two or three or four years. However, it takes for the lawsuit to be completed every time an alleged adverse employment action is taken, and that would automatically satisfy a prima facie burden under the retaliation law. Is that your theory here? Or is there some way of looking at the underlying lawsuit in a different perspective in terms of serving as the predicate protected act? Well, Judge Block, I just don't think that the following of the lawsuit in and of itself ought to prevent an employer from still running the workplace that the employer has to run. It shouldn't have a chilling effect upon the employer. I mean, every time the employee does something, it could result in a retaliation claim during the pendency of that lawsuit. Is there something about that that's disconcerting to you? Yeah. Well, if it were just the lawsuit alone, I would say perhaps, but it's not just the lawsuit. What else here? Can you show me anything specifically that you think, separate apart from the pendency of the lawsuit, that falls into the category of retaliation here? Well, when we get into the time frame, December 98 until the year 2000, I believe, we have a series of the When the lawsuit is pending. Go ahead. When the lawsuit is pending. Take that out of the equation. Take that out of the equation. Okay, so we have the new charges being filed, which are occurring periodically on 399, 799, 3 of 2000, and 4 of 2001, all right, raising new claims that are occurring in the workplace, and in particular, the sexual harassment claim that was filed on August 4th, 1998, which was not part of the original lawsuit. Where's the retaliation? Well, the retaliation comes over a course of time here, where Watson co-workers in her workplace are now engaging with apparent supervisory knowledge and ratification. Give me some specifics. I see, for example, it seems to me possibly the closest example you have is August 8th, 2000, when allegedly her assignment duties were changed somewhat. If you were to assume that was an adverse employment action, does that really satisfy the requisite causal connection? Well, I have several, Judge Block, so let me share them with you, okay? I listed lab instruments being sabotaged by co-workers, beginning in 1998 and continuing until 2010. On that one, this is a very unpleasant incident. It does appear to be sabotage, but what evidence do you have that that was retaliation for the filing of the lawsuit, as opposed to a bad prank, a misguided, perhaps an ill-intended prank, but really having nothing to do with the lawsuit? Do you have any evidence that this was done, for example, by her superiors, or that the lawyers for the water district came over and sabotaged the instruments? What's the connection? Well, we don't have any direct evidence of that, Judge Bybee, obviously, because no one has come out and said, there's no evidence in the record that I've found that said, your instruments were being sabotaged because you filed a lawsuit. We just don't have that kind of a causal link here. I mean, I think we have enough circumstances or circumstantial evidence to raise an inference that there's a causal link, which I believe that issue should have gone to a jury. And I might say, if I may, this Court, in a case that was published after we briefed, the Pollin v. Chertoff case, in footnote 2, this Court said, at the prima facie stage of a retaliation case, the causal link element is construed broadly, so that the plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. I mean, now, I don't think that, given that standard for determining causal link, I think that certainly Ms. Watson had, can meet that standard, and that Judge Proh was in error for dismissing that retaliation claim. Is it such a thing as a super sensitive client or a super sensitive employee? You have a lawsuit pending for two years, a period of time, almost every time somebody breathes or does something, you know, there's a claim of, you know, retaliation. Is there some sort of concept here that you look at the nature and the quality of the alleged adverse employment action and compare it to the pendency of the lawsuit and have some sort of a practical overview, or are you going to just let somebody file a complaint? They have to complain and complain every day because her nose is out of joint, so to speak. Judge Block, I think that, to get to the point, I think that had the Water District stepped in, in the initial time frames, when the first lawsuit and the events given rise to the first lawsuit occurred, and had promptly acted to remediate the environment at that time with those sexual harassment claims and those racial harassment claims and those retaliation claims, we might not be here today. But the Water District did no such thing. And the Water District's failure constantly to act in the face of the complaints to try to correct and embolden the coworkers and the managers just to continue to do it. And so Ms. Watson, of course, as is her right, continued to make charges and continued to file lawsuits. But a lot of these charges seem rather minor, arguably adverse employment. You can almost debate each one as to whether they meet the standard. I mean, so how do you look at these multiple charges by disgruntled employee in the context of the litigation? That's what I'm wrestling with here. I just want to share that with you, and maybe you can respond to that. Well, I think if you just, taken alone, perhaps, except, as you said, the reassignment of duties and the increased workload as a result of those duties, taken alone, you know, none of these adverse actions as we're going to broadly describe them as being might not get us over the legal threshold. But when I hear things about reports that she's responsible for being trashed or unsubmitted by her immediate supervisor, and I hear coworkers reporting to her unreliable and incorrect data that she's being held responsible for, and I hear accusations of even, okay, let's say false accusations of being absent from work. But they happened a significant period of time after she initiated her lawsuit. I don't see even the temporal connection here. Well, I think the temporal connection is also supplied by the fact that we have three layers of protesting going on. We have the lawsuit, the administrative charges, and the informal complaints being made internally to the employer. So how do you separate all these out to get a clearly defined idea of this is connected to that, that's linked to this, when it's just continuous over a period of this period of time, 98 to 2000, just about. I don't know how to, I probably don't know how to satisfy your question, but I think that it comes to a head, though, when, you know, she's actually threatened or there's attempts made to sicken her by putting contaminated instruments around her food in her office. I mean, it gets so real that the employees are emboldened to try to sicken her in the workplace with contaminated instruments. I mean, how far do we have to go? How shocking does this have to become? But that happened on the heels of what? Protected activity. That's what I'm trying to get a handle on. Well, which one of the several complaints, informal complaints, which one of the several charges? I mean... You're over your time, but you can answer the question. Am I over my time, Judge Thomas? Yes. Well, the closest one I can come to in terms of the administrative charges, putting the date, March of 2000? Is that right? What happened then? I believe that is, I think that's the closest one to that particular event. You're talking about an informal complaint, EEOC, what? I believe that's one of the NERC or EEOC charges, which comes on that date. So we have a period of time between July of 99 and March 2000 where this event takes place. It's a significant passage of time here. I understand, Judge Block, but we have a lot going on in this work environment. We have a lot of informal complaints being made, and we have a lot of nothing being done. I would... Thank you, counsel. Our questions took you over time, but we'll give you a couple of minutes for rebuttal. Thank you, Judge Thomas. May it please the Court, good morning. Scott Mahoney for the Water District. I'll start with the retaliation since that was the focus of Mr. Tufano's argument. I think there is a lack here of both material adverse actions and of a nexus between those actions and a protected activity. I think Justice Bybee hit it right on the head. Talking about the sabotage, it's alleged that the sabotage went on for, on a weekly or more, for a period of about three years, the end of 98 to the end of 2001, and yet nowhere in this, during the trial, in this three years of alleged sabotage is there any indication of who committed the sabotage, if it was committed, what the purpose or motive was behind the sabotage, whether it was directed or acquiesced in by the Water District. There's just nothing there on the sabotage. There's a suggestion that cameras were put into the workplace to conduct surveillance directed at Ms. Watson, but if you look at the citations to the record for that proposition, it merely establishes that cameras were installed in the workplace. It doesn't say they had anything to do with trying to get any kind of evidence of wrongdoing or anything against Ms. Watson. The assignment of work duties, the August 8, 2000 memo that was admitted into evidence, that indicates that there was a reassignment or a shifting of duties for all the ten or so people in the laboratory who held the chemist to job title. And ironically, during part of the trial, there was testimony by Ms. Watson that there were times where she was overburdened, that she was having trouble getting help with some assignments, and that was supposedly retaliation. But when this memo comes out and she claims that it was somehow diluting the quality of her work assignments, then she said that was retaliation. What's the Water District to do? Damned if you do, damned if you don't. There's the December 2000 warning notice, but that was, it's undisputed that Ms. Watson complained about that, and it was rescinded. The Brooks case tells us otherwise. It's hard to say this was a friendly work environment for her. I can't say it was friendly or unfriendly, but what I'm saying is, is... On their whole lot of episodes, I mean, I understand the problem with perhaps connecting them up with causation, but it strikes me as you step back from it, there is certainly a, in the normal sense of the word, a fairly hostile work environment. Why isn't there a tribal issue of fact as to whether it's a legally hostile environment? Well I think there are a number of episodes, because we're talking about a three-year period or so, but I'm wondering if it's really hostile in the sense that, are these all adverse actions or are these just unfortunate things that happen from time to time to anyone, whether they've engaged in a protective activity or not? For example, the incident where Frank sends an email to Ms. Watson saying you were absent without turning in a leave slip. The supervisor steps in and says, no, she did submit one, and that was the end of the incident. Nothing happened with it. She testified. Frank eventually apologized for it. I mean, is this kind of thing, I would think, happens to a lot of people at some point in their... But at what point would a series of unfortunate events, as you put it, create a tribal issue of fact? I mean, at some point, you have to say... I think, well, clearly, if they could be linked to the water district, that the water district knew who was committing these things, didn't step in to do anything about it, and there was some verification that the incidents had actually occurred, certainly I think that could be something if the water district directed these kind of activities, if the supervisor said, you know, pulled a group of her co-workers in and said, go make her life miserable for complaining. But you never get that kind of proof in these kind of cases. What you usually have is a series of anonymous actions, whether it's posting on a bulletin board or some slanders directed in other places. I mean, it's not uncommon in these cases to have anonymous actions. I mean, that's what gives rise to a hostile work environment claim in many cases. Well, yeah, I agree that the smoking gun evidence is often not there. I mean, you rarely get someone who says, yes, I really did intentionally discriminate against this person. That's rare to see. But the incidents all in total really, I don't think, amount to an adverse action. I mean, there can be a variety of things that can constitute, you know, the creativity of people, I guess, puts no limits on adverse actions. But, you know, if you're looking at what really happened, no demotion, no pay cut, no termination, certainly, those aren't the only things that can be adverse actions. But she didn't, you know, she spent a lot of time during the trial talking about, I didn't get the opportunity to, or my data was, I got unreliable data or my reports were missing or even trashed and things like that. But even if all that were true, and I assume Judge Proe believed it to be true, they still didn't have any serious repercussions on the workplace for her. They did not, as a result of all this, she wasn't given a poor evaluation. She wasn't demoted. Again, the pay wasn't cut. She wasn't disciplined. To the contrary, she got pay increases and she consistently got evaluations that she met expectations. And from 1998, she got a 5.5% pay increase. And thereafter, every year, culminating in 2002, with a 2.25% pay increase. Was that consistent with the pay increases given to other employees? I don't believe there's evidence in the record one way or another that would address that. There was showing that she had a progression of pay increases and that over a period of, I believe, four years, the pay went from 57 to 70 or 71,000. I'm not sure what the other part is. The quality of her work was consistently recognized and rewarded financially. I would agree with that, yes. Let me address briefly the sexual harassment. I have about three minutes. There seems to be an attempt in the brief, an urging that the court adopt the Second Circuit decision in the Howley case and find that the Daniel Wynn incident, the comments in the laboratory by itself, be deemed a sufficiently severe or pervasive to, I guess it would have to be only severe, to be a hostile work environment. I don't believe that the court would adopt Howley and I don't believe it would adopt the Wynn incident as being sufficient. And my belief is based on the Brooks case. In the Brooks case, there were, for a period of several minutes, Ms. Brooks was subjected to sexual advances, which culminated with the harasser reaching under Brooks' sweater and bra and fondling her bare breast. And Justice Kaczynski said in that case that there may come a time where the circuit has to decide whether a single incident is going to be sufficient to create a severe environment for purposes of the court. But let me ask you this. Wasn't Brooks removed out of the employment environment in that case? He was relocated. And in this case, the harasser stayed? Well, there was prompt remedial action in Brooks, but before you even get into that issue, you have to decide whether the environment was sufficiently severe and He was no longer in the environment, is what I'm saying, whereas in this particular case, the harasser stayed in that environment. Well, I'm glad you raised that, Judge Block, because I think something that they're arguing that seems to be lost in the facts here is that Mr. Wynn was not a chemist two or a chemist one. He had a different job position, and his job, his primary duties required him to go out in the field and collect water samples. This wasn't a situation where he was working side by side with her in the laboratory 40 hours a week. And the fact is, within the course of two weeks from the date of her complaint, there was an investigation done. Isn't it a stronger argument that the employer took remedial action here, and so basically that really takes care of your concerns in terms of whether there can be a harassment claim here or a hostile work environment claim, I should say? Even if this was to be considered to be severe and pervasive, the employer took immediate remedial action. So how can the employer be held accountable? Isn't that your better argument? Well, immediate would require it being done within a day, but within the course of two weeks, there was an investigation. He admitted to it. He was suspended without pay. Right. And there was never any other incident there. There was never any other incident. So the employer's behavior was productive. It actually, you know, did produce this positive result. That was the end of the problem, right? The Ellison case says it has to be reasonably calculated to end the harassment, and the Fuller case says that if the harassment stops, that's a measure of the efficacy of the Proof is in the pudding here. That's correct. How do you deal, for example, with the Windemeyer case in which there was an employee was sent out and was harassed off the job, and then by someone who was not even associated with the company. But then she came back, and the company sent her back out, at least into that environment and their liability attached to that. It's really just one single episode. I mean, we looked at Brooks and felt that Brooks did not prevent that. In light of your one episode, how do you distinguish Windemeyer? Well, first of all, Windemeyer was a rape. Yeah. But you're saying one episode. I'm not saying. I'm sure. That was your argument in Windemeyer, exactly, that Brooks prevented it because it was only one episode. That was a factor, definitely. In Windemeyer, the employer, the facts seemed clear, was more concerned with, I think it was the Starbucks account, whatever the account was, with keeping that account and making them happy than they were with the plaintiffs. Admittedly, very serious circumstances here. There was no condoning of Mr. Wind's activities here. He was suspended. So don't we have to look at, as Judge Block suggests, not the fact that it's one episode, because Windemeyer and some other cases indicate that one episode may be enough. We have to look at the severity of the episode. We have to look at the response of the employer, right? You can't judge Adam Brooks by saying it's one episode and therefore we're entitled to summary judgment. It doesn't seem to me. Well, I think there's a threshold before you even get to the employer's remedy of whether there was a hostile environment that had to be, legally had to be remedied. I mean, everyone agrees that, you know, I mean, everyone agrees that the Wind comments are clearly inappropriate and could be sexual harassment. But whether that alone is sufficient to, I mean, otherwise, I mean, any comment would be sexual harassment and the remedy would kick in. But I think this is actually more analogous, the Wind incident is more analogous to the so-called Lima incident in the Manat v. Bank of America case. In that case, there was some element of, not, didn't involve 20 employees, but there was an element of the employee being ridiculed or humiliated in front of several coworkers over her accent and pronunciation of things. And in that case, the court, of course, said that, again, a regrettable, inexcusable incident, but that incident coupled with a couple other things that had occurred was not sufficient to create a hostile work environment and they never had to get into the remedy, although they did, in dicta, in a footnote, say that, by the way, the supervisor did come in and admonish the harasser and it never happened again. They seemed to think that was okay, but that wasn't central to the decision. But I think there is a combination, I think there is a lack of a hostile environment, but even if it existed, there was a sufficient remedy in this case. I'm up with my time, but happy to answer any other questions. You've exceeded your time, but there may be some more questions. Any questions from the panel? All right. Thank you, counsel. Thank you. We'll give you two minutes for rebuttal. Thank you, Your Honor. I'd like to, I just, I'd like to say that I think Judge Proe erred as the appellees continue to err in treating this as just mere inappropriate behavior, inappropriate language. This is not a single epitaph or derogatory comment or humiliating comment directed at a woman in the workplace. This is the employee took corrective action. The employer took corrective action, even if what you say is true, and I tend to think there's some substance to what you say, but what happened thereafter? The employer punished the person, docked the person, reprimanded the person, and nothing happened thereafter. Isn't that really what the standard of the law is, that we ought to apply? Look at the employer's behavior? I think the employer's behavior, Judge Block, in this instance is atrocious. I don't think the employer did a proper investigation. I don't think the employer conducted What else was the employer supposed to do? Well, there were 20 people in that room when that event occurred, and the employer's representative interviewed two, both men, and didn't, made no effort to interview any of the other three women. Now, can we sit here and be sure that those three women did not Watson in the workplace? Reasonably calculated to eliminate harassment in the workplace, that should have happened the first time around. The discipline was a one-day suspension without pay, which the person responsible for the conduct, Wynn, testifies that he doesn't even remember what the discipline was, and Now, how did this eliminate sexual harassment in the workplace if the There were never any subsequent problems, though. Whatever action the employer took seemed to, you know, seem to do the job. There was no further problem. Well, I respectfully disagree, Judge Block. I would also like to address Justice Thomas's argument, obviously. In reference to this Court's recent decision in Craig v. M&O Agencies, Inc., we don't have to have Windermeyer-type situations or Draper-type situations. This Court has never held that Title VII requires proof of such severe or because we go back to the beginning, we have Ellison v. Brady, which the Court in that particular opinion described the conduct as a misguided love letter and well-intentioned compliments by coworkers. Now, we're somewhere, it looks to me, to follow the tracking of the opinion in Craig, somewhere this conduct of Wind is somewhere between Ellison, which this Court has ruled in the past constituted a hostile work environment, and perhaps Craig itself, in which this Court again ruled that it constituted a hostile work environment. I mean, the idea that a single isolated incident that goes on for 20 minutes, given the context of 20 people and a workplace setting, the humiliation, the embarrassment and the ridicule that Ms. Watson was being subjected to in front of those 20 people, along with what was being said in graphic detail, I think that was Judge Pro's terms, graphic detail, sexually explicit, obscene, abusive language in the context of 20 minutes, and I think that's a good argument.   And I think that's a good argument. And I think that's a good argument. Does that constitute one inappropriate comment? One of the ---- You're over your time now, so why don't you ---- well, thank you for your argument. Thank you, Judge Thomas. Thank you, Your Honor. The case just heard will be submitted for decision. The next case on the oral argument calendar is Lance v. Crate.
judges: Thomas, Bybee, Block